**EAST EUROPE DOMESTIC INTERNA-
TIONAL SALES CORP., Plaintiff,**

v.

**ISLAND CREEK COAL SALES COMPA-
NY, Tiger, Inc., EEI Energy, Inc., and
A.L. Watson & Co., Inc., Defendants.**

**No. 81 Civ. 7861(MEL).**

United States District Court,
S.D. New York.

Oct. 3, 1983.

Halperin, Shivitz, Eisenberg, Schneider & Greenawalt, New York City, for plaintiff; William S. Greenawalt, Robert Ruescher, New York City, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant Island Creek Coal Sales Co.; Janet P. Kane, Arthur D. Rheingold, New York City, of counsel.

Blum, Haimoff, Gersen, Lipson, Garley & Niedergang, New York City, for defendant A.L. Watson & Co., Inc.; Louis Haimoff, Ralph Wood, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendant EEI Energy Inc.; Peter Gruenberger, Nancy E. Barton, Ronald D. Reynolds, New York City, of counsel.

Schapp & Cordover, Brooklyn, N.Y., for defendant Tiger, Inc.

LASKER, District Judge.

Island Creek Coal Sales Company ("Island Creek") and A.L. Watson & Company, Inc. ("Watson") move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on the grounds that (1) the statute of frauds bars enforcement of the alleged contracts upon which the complaint is based, and (2) recovery for breach of contract is barred because plaintiff, East Europe Domestic International Sales Corp. ("East Europe"), did not provide the letter of credit required under its alleged contracts with Island Creek and Watson. Watson, along with Tiger, Inc. ("Tiger"), also seeks summary judgment on the additional ground that East Europe is without legal capacity to bring the instant lawsuit, because East Europe's certificate of incorporation has been voided by the state of Delaware for non-payment of taxes, and because the corporation has never been authorized to do business in New York State, where it maintains its principal office.

East Europe is a corporation which, during the late '70's, was active in the export of various commodities, including coal. Its president and sole owner, officer and director is Robert Ross. In May 1979 East Europe entered into a contract with Eregli Iron & Steel Works Company ("Eregli") of Turkey, not a party to this action, which required East Europe to supply Eregli with 380,000 dry metric tons of coal at a price of $52.50 per dry metric ton. The complaint alleges that East Europe entered into contracts with each of the defendants successively during the period between May and December 1979 to purchase coal for resale to Eregli, and that each of the defendants breached its contract with East Europe by failing to supply the coal. The first cause of action alleges that East Europe and Island Creek entered into a contract on or about May 23, 1979 under which Island Creek agreed to supply East Europe with 380,000 dry metric tons of coking coal between June 1979 and May 1980 at a price of

$49.40 per dry metric ton. The second cause of action alleges that on or about June 13, 1979 East Europe entered into an identical contract with Tiger. The fourth cause of action[1] alleges that in December 1979 East Europe entered into a contract with Watson and EEI Energy Company ("EEI")[2] pursuant to which they agreed to supply East Europe 380,000 dry metric tons of coking coal at a price of $50.50 per dry metric ton.

## I. *Island Creek*

New York Uniform Commercial Code ("N.Y.U.C.C.") § 2–201(1) provides:

"Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing."

East Europe points to two documents which, it claims, adequately reflect a contract with Island Creek for 380,000 dry metric tons of coal. The first of these is the "Purchase Order and Contract" dated May 23, 1979,[3] which East Europe sent to Island Creek with a transmittal letter dated May 25, 1979.[4] The "Purchase Order and Contract" sent by East Europe followed an exchange of telexes on May 14th and 15th confirming an agreement for shipment of a 40,000 ton test cargo of coal, meeting specifications set forth in the telexes, at $49.40 per metric ton.[5] As summarized in the letter of May 25th, the "Purchase Order and Contract" set forth an agreement for 380,000 dry metric tons of coal to be shipped over a 12-month period in 40,000-ton installments, payment to be made by irrevocable confirmed letter of credit to be opened by the end of June 1979. The second document relied on by East Europe as satisfying the statute of frauds is Island Creek's response to East Europe's "Purchase Order and Contract," contained in a telex dated June 4, 1979.[6] That telex states, in pertinent part:

"We have received your proposed contract form which was in much more detail than was agreed on. In our proposal we made an offer of 40,000 metric tons at a price of $49.40 per metric ton. The $49.40 metric ton price is based on an 8–9 percent moisture content and not on dry metric ton basis content and this was firm for this individual shipment only. We do represent ash, sulfur, volatile matter on dry basis.

"In our correspondence, we indicated that after the test shipment is used at the plant and if it is satisfactory, we would then work out details to supply 400,000 metric tons of similar coal. Any future tonnage will be subject to railroad escalation during the term of time period we agreed to. Regarding loading of vessels, we will not accept vessel demurrage and this was not discussed.

"Your proposed contract is being reviewed by our legal department. However, there is much on this we did not discuss. If you desire, we will submit an agreement in the form that we understood we agreed to."

1. The complaint originally alleged as a third cause of action that Island Creek also breached a contract negotiated in October 1979; that claim has been withdrawn.

2. EEI originally joined in Watson's motion for summary judgment. Subsequently, EEI informed the court, by letter dated March 22, 1983, that EEI has filed a Chapter 11 petition for bankruptcy. Pursuant to Section 362 of the Bankruptcy Code, an automatic stay against prosecution of this and all other proceedings against EEI is now in effect.

3. Ex. G. to Affidavit of Janet P. Kane, counsel to Island Creek ("Kane Affidavit").

4. Ex. F to Kane Affidavit.

5. Exs. D, D₁, and E to Kane Affidavit.

6. Ex. J to Kane Affidavit.

Island Creek argues that East Europe's Purchase Order is clearly insufficient to satisfy the statute of frauds, because the document is not a writing signed by Island Creek. Moreover, according to Island Creek, the June 4th telex, which was signed by Island Creek, is plainly a rejection of the terms set forth in the Purchase Order, and does not reflect an agreement to the terms of the contract alleged in East Europe's complaint. East Europe acknowledges that the May 23rd Purchase Order is not signed by Island Creek, but invokes the provisions of N.Y.U.C.C. § 2–201(2) as obviating the need for Island Creek's written agreement. That section provides:

> "Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) [of the statute of frauds] against such party unless written notice of objection to its contents is given within ten days after it is received."

Clearly, Island Creek sent its June 4th telex within ten days of its receipt, on May 29th, of the proposed Purchase Order and Contract. East Europe nevertheless argues that the June 4th telex did not constitute an adequate notice of objection under N.Y. U.C.C. § 2–201(2). Instead, East Europe argues, the June 4th telex concedes the existence of a contract to supply coal, and merely proposes additional terms to be added to the contract.

East Europe's argument is unpersuasive. East Europe relies primarily upon *Leonard Pevar Co. v. Evans Products Co.,* 524 F.Supp. 546 (D.Del.1981), and *Marlene Industries Corp. v. Carnac Textiles, Inc.,* 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239 (1978), neither of which supports East Europe's position. Both cases involve a "battle of the forms" situation not presented by the facts of the instant case. In both *Pevar* and *Marlene* the seller, in response to a written purchase order sent by the buyer, sent the buyer an *acknowledgement* con-

taining boilerplate language which added additional terms not set forth in the buyer's purchase order. Because the seller's response was in essence an acknowledgement rather than a rejection, the *Pevar* and *Marlene* courts held that the writings satisfied the statute of frauds and that the effect of the additional terms contained in the acknowledgement should be analyzed in accordance with the provisions of N.Y.U.C.C. § 2–207, which governs the treatment of additional terms contained in "[a] definite and seasonable expression of *acceptance* or a written *confirmation*" (emphasis added).

Island Creek's June 4th telex is not a form acknowledgement containing additional terms in boilerplate language. Instead, it contains specific objections to major provisions of East Europe's proposed Purchase Order and Contract, including the quantity (40,000 tons with an agreement to negotiate terms for future shipments versus a firm agreement for 380,000 tons) and the unit of measurement (metric tons based on an 8–9 percent moisture content versus dry metric tons). As to the latter distinction, it is undisputed that a dry metric ton represents a greater quantity of coal than a metric ton based upon a 8–9 percent moisture content.[7] Thus, by any fair reading of the June 4th telex, the telex constitutes a "written notice of objection" as provided in N.Y.U.C.C. § 2–201(2), and cannot at the same time be relied upon by East Europe as a writing setting forth the very contract which the telex rejects. Accordingly, the statute of frauds bars any action based upon a contract for 380,000 dry metric tons of coal, as described in East Europe's complaint.

East Europe argues further, however, that a series of telexes and letters exchanged between the parties between April 30th and May 15, 1979 satisfies the statute of frauds at least to the extent of 240,000 dry metric tons of coal. The first of these writings is a telex from East Europe to Island Creek dated April 30, 1979, in which East Europe offers to purchase 240,000

---

7. *See* Part II, *infra.*

metric tons of coal meeting specifications set out in the telex.[8] The second is a teletype from Island Creek to East Europe of the same date, which, in apparent reference to East Europe's earlier telex of that day, sets forth alternative proposals as to certain specifications, and states "[a]ll other items look to be in line."[9] The next document in the series is a telex dated May 13, 1979 from Island Creek to East Europe, stating further objections to size specifications proposed by East Europe.[10] That telex is followed by another from Island Creek to East Europe dated May 14, 1979, confirming an offer to ship a "40,000 test cargo" in the latter half of June.[11] The final two writings relied upon by East Europe are telexes from East Europe to Island Creek dated May 14th and 15th, confirming the specifications proposed by Island Creek and stating East Europe's acceptance of the offer contained in Island Creek's May 14th telex.[12]

██ It is true, as East Europe argues, that the statute of frauds may be satisfied by a series of writings setting forth the essential terms of the alleged contract, even if some of the writings relied upon are not signed by the party to be charged. *APS Food Systems, Inc. v. Ward Foods, Inc.,* 70 A.D.2d 483, 421 N.Y.S.2d 223 (1st Dep't. 1979); *Crabtree v. Elizabeth Arden Sales Corp.,* 305 N.Y. 48, 110 N.E.2d 551 (1953); *Reprosystem B.V. v. SCM Corp.,* 522 F.Supp. 1257, 1277–78 (S.D.N.Y.1981). In the instant case, however, the writings relied upon by East Europe simply do not reflect an agreement by Island Creek to supply 240,000 tons of coal. The only writing which mentions a quantity of 240,000 tons is *East Europe's* telex of April 30, 1979. Even if Island Creek's telex of the same date, setting forth a counter-offer, without any reference to quantity, is assumed to refer to East Europe's telex, it is undisput-ed that Robert Ross, East Europe's president, rejected the offer made in Island Creek's April 30th telex.[13] The remaining telexes, which were exchanged between May 13th and 15th, do not refer by their terms to a quantity of 240,000 tons, nor can they fairly be read as referring to or incorporating East Europe's April 30, 1979 telex which mentions that amount. To the contrary, Island Creek's telex of May 14th states an offer to ship a 40,000 ton test cargo. It follows that the statute of frauds bars East Europe's attempt to recover on an alleged contract for the purchase of 240,-000 tons of coal.

## II. *Watson*

Watson, like Island Creek, contends that there is no writing sufficient to satisfy the statute of frauds with respect to the contract to supply 380,000 dry metric tons of coal alleged to have been concluded between Watson and East Europe. Watson argues that the only contract between the parties was for a quantity of 30,000 metric tons, as reflected in several telexes exchanged between the parties on December 6, 1979. The first of these, sent by Watson to East Europe, reads in relevant part:

"We are pleased to offer one trial vessel for late December 1979 or early January 1980, with the following specifications.

\* \* \* \* \* \*

Quantity 30,000 metric tons Price $50.50 per metric ton F.O.B. Cars Pier [other specifications omitted] As discussed payment would be made by letter of credit opened with Irving Trust in the amount of $52.50 per metric ton with $2.00 per metric ton returned to you."[14]

East Europe's response to this telex states:

"With reference to your telex of December 6, 1979 we accept your firm proposal

---

**8.** Ex. B to Kane Affidavit.

**9.** Ex. 8 to Affidavit of Robert Ross.

**10.** Ex. C. to Kane Affidavit.

**11.** Ex. D to Kane Affidavit.

**12.** Exs. D$_1$ and E to Kane Affidavit.

**13.** Deposition of Robert Ross, at 59.

**14.** Ex. H to Affidavit of Ralph Wood, counsel to Watson ("Wood Affidavit").

with the exception that the price of 50.50 per MT should be stowed and trimmed vessel Hampton Roads Virginia. We have requested Eregli to nominate their ship for loading December 29, 1979—January 12, 1980 from Hampton Roads Virginia the specifications of the coal per our contract are as follows:

[specifications omitted]" [15]

East Europe argues, however, that a letter sent by East Europe to Watson on December 11, 1979 is adequate to satisfy the statute of frauds with respect to the additional 350,000 tons. That letter specifies, in relevant part:

"We hereby confirm our order for the 30,000 MT of Coal, with the balance of 350,000 MT to be shipped as we receive the irrevocable Letters of Credit." [16]

It is undisputed that Watson did not send any notice of objection to East Europe disclaiming the existence of an agreement to supply an additional 350,000 metric tons of coal. It follows, according to East Europe, that the December 11th letter is sufficient under N.Y.U.C.C. § 2–201(2) (quoted in Part I, *supra* ), which provides that between merchants, a confirming memorandum sent to the party to be charged satisfies the statutory requirements unless notice of objection to its contents is sent within 10 days of its receipt.[17] The only argument Watson makes as to the insufficiency of the letter of December 11th is that the letter is "merely an expression of hope that further business could be done," and that any further obligation on Watson's part was dependent upon East Europe's obtaining further letters of credit.[18]

■ While it is true that, under the terms of the December 11th letter, the obtaining of further letters of credit was a condition precedent to Watson's obligations to supply additional coal, it does not follow that the statute of frauds bars East Europe's attempt to prove that the parties entered into a valid contract for the additional 350,000 tons, under which East Europe was obligated to obtain further letters of credit and Watson was obligated to sell East Europe the coal as and if the letters of credit were supplied. The condition precedent set forth in the December 11th letter relates not to the *formation* of the contract, but only to the terms of the parties' performance.

■ Thus, in the absence of any written objection to East Europe's letter referring to an agreement to purchase an additional 350,000 metric tons of coal from Watson, the letter is adequate to satisfy the statute of frauds. Of course, this conclusion does not establish as a matter of law that the contract as alleged by East Europe was concluded between the parties. Instead, to hold that the statute of frauds is satisfied means only that East Europe is not barred from attempting to prove that the parties entered into the contract alleged by East Europe. As the Official Comment to § 2–201 states, when the requirements of the statute of frauds are met by a written confirmation to which no objection was sent by the party to be charged, "the burden of persuading the trier of fact that a contract was in fact made orally prior to the written confirmation is unaffected." [19]

Watson argues further, however, that any obligation on its part to supply coal to East Europe was excused by East Europe's failure to provide a conforming letter of credit for the first 30,000 ton shipment. The letter of credit supplied by East Europe was for 30,000 metric tons of "dry coking

---

**15.** Ex. J to Wood Affidavit.

**16.** Ex. E to Wood Affidavit.

**17.** As East Europe correctly points out, the writing is sufficient even if it omits terms such as the price and the time and place for delivery, as long as the quantity is stated. *See* Official Comments to U.C.C. § 2–201, ¶ 1 (McKinney's 1964).

**18.** Memorandum of Law of Defendants A.L. Watson and EEI Energy, Inc. in Support of their Motion for Summary Judgment, at pp. 12, 18.

**19.** Official Comments to U.C.C. § 2–201, ¶ 3 (McKinney's 1964).

coal,"[20] which, according to Watson, represents a quantity of coal significantly different from 30,000 "metric tons of coal." As explained in Watson's memorandum of law:

"A dry metric ton is that quantity of coal which, if it did not contain the moisture which is present in all coal, would weigh one metric ton. Because of the presence of moisture, a dry metric ton contains more coal than a metric ton. A metric ton of coal containing 8% moisture . . . would only constitute 92% of a dry metric ton, and, for example, 30,000 dry metric tons would be equivalent to 32,608 metric tons."[21]

Watson argues that the parole evidence rule, N.Y.U.C.C. § 2–202, bars any attempt by East Europe to prove that the contract was intended to provide for the purchase of dry metric tons of coal, since the writings setting forth the contract all express the quantity in terms of metric tons rather than dry metric tons. East Europe does not dispute that a "dry" metric ton is a greater quantity of coal than a "wet" metric ton,[22] but argues that the use of the term "metric tons" can be consistent with a contract either on a "wet metric ton" or "dry metric ton" basis, and that in the context of the negotiations between Watson and East Europe the contract was understood to be on a dry metric ton basis.[23] In response, Watson argues that, because East Europe's negotiations with Island Creek and Tiger, prior to its dealings with Watson, fell through in large part because of those defendants' refusal to deal on a dry metric ton basis, East Europe would surely have specified dry

metric tons in its negotiations with Watson if it had intended to obtain a contract on a dry metric ton basis. East Europe answers that the letter of credit it provided to Watson referred to dry metric tons, and that Watson received a copy of it before making its firm offer for a trial vessel of 30,000 metric tons on December 6th.[24] East Europe contends that, in light of Watson's knowledge of the terms of the letter of credit, Watson's subsequent refusal to accept the letter of credit, which was communicated to East Europe on January 2, 1980, was both unjustified and untimely.[25]

■■■ N.Y.U.C.C. § 2–202(a) provides that a written agreement may be explained or supplemented by extrinsic evidence of a "course of dealing or usage of trade . . . or by course of performance." *See Rose Stone & Concrete, Inc. v. County of Broome,* 76 A.D.2d 998, 429 N.Y.S.2d 295 (3rd Dep't. 1980); *Eskimo Pie Corporation v. Whitelawn Dairies, Inc.,* 284 F.Supp. 987 (S.D.N.Y.1968). It is true that the admissibility of such evidence does not extend to evidence of purely subjective intent, but is limited to evidence of objective facts showing the meaning to be attached to contract terms. *Eskimo Pie, supra,* 284 F.Supp. at 992. However, East Europe does not argue simply that Ross believed he was negotiating on a dry metric ton basis, but instead that the course of the negotiations—*e.g.,* Watson's alleged receipt of the letter of credit referring to dry metric tons prior to sending its telex of December 6th—shows the existence of a common basis between the parties for interpreting "metric tons" to be

---

**20.** Ex. G to Wood Affidavit.

**21.** Memorandum of Law in Support of Summary Judgment Motion, at 5.

**22.** The parties' telexes and documents generally do not use the term "wet," but instead refer either to metric tons or to dry metric tons. However, as indicated in telexes exchanged between Island Creek and Eregli, the term "wet metric tons" is sometimes used in place of the term "metric tons." Exs. 5, 5₁ to Ross Affidavit.

**23.** Ross Affidavit, ¶¶ 25–35.

**24.** Ross Affidavit, ¶ 20.

**25.** Watson disputes East Europe's contention that Watson received a copy of the letter of credit prior to December 6th, and also claims that Ross was notified of Watson's objections to the letter of credit prior to January 2, 1980. On a motion for summary judgment, however, all disputed factual issues must be resolved in favor of the non-moving party in evaluating the appropriateness of a grant of summary judgment. *See Schering Corporation v. Home Insurance Co.,* 712 F.2d 4 (2d Cir.1983). Our discussion of East Europe's contentions, of course, implies no view as to the merits of the disputed items.

consistent with a contract for "metric tons of dry coking coal," the phrase used in the letter of credit. Evidence of such objective circumstances would be admissible upon trial of the case, and hence Watson's argument that it was excused from performance because as a matter of law the letter of credit did not conform to the agreement between the parties must be rejected.

■ Watson contends further, however, that East Europe's action is subject to dismissal because East Europe lacks legal capacity to prosecute the action. Watson initially argued that East Europe lacked capacity under the law of Delaware, the state of East Europe's incorporation, because its certificate of incorporation had been voided for non-payment of taxes, as well as under the law of New York, because East Europe has at all times maintained its principal office in New York but has never been authorized to do business in New York by the New York Department of State as required by Section 1301 of the New York Business Corporation Law. Since the filing of Watson's motion for summary judgment, however, East Europe has renewed its charter under the laws of Delaware, thus removing any impediment to its legal capacity under Delaware law.[26] Nevertheless, East Europe has not to date notified the court that it has succeeded in qualifying to do business in New York, as the court directed it to do at oral argument on the instant motions. Ross originally represented that he would take all necessary steps to secure such authorization in his affidavit of January 19, 1983. In view of the lengthy period of time that has been granted to East Europe thus far to secure the required authorization, the action will be dismissed as to all defendants unless within 10 days from the date of this opinion East Europe presents evidence establishing that it has qualified to do business in New York.

In sum, Island Creek's motion for summary judgment dismissing the complaint as to it is granted. Watson's motion for summary judgment is denied, with the proviso that the complaint will be dismissed as to all

remaining defendants unless within 10 days of the date of this opinion East Europe establishes to the court's satisfaction that it has secured the necessary authorization to do business under New York law.

It is so ordered.

26. *See* letter of July 6, 1983 from William Greenawalt, counsel to East Europe.