COASTAL AVIATION, INC., Plaintiffs,

v.

**COMMANDER AIRCRAFT COMPANY, Defendant.**

**No. 92 CV 4229 (BDP).**

United States District Court, S.D. New York.

Nov. 3, 1995.

---

John A. Tartaglia, White Plains, NY, for plaintiff.

Philip M. Halpern, Pirro Collier Cohen Crystal & Bock, White Plains, NY, Richard A. Groenendyke, Hall, Estill, Harwick, Gable, Golden & Nelson, Tulsa, Oklahoma, for defendant.

## OPINION AND ORDER

PARKER, District Judge.

Plaintiff, Coastal Aviation Incorporated ("Coastal"), brings this action against Defendant, Commander Aircraft Company ("Commander"), seeking $5,319,424 damages arising out of an alleged breach of a contract for Coastal's exclusive dealership rights to sell airplanes. Defendant now moves this Court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff also cross moves for partial summary judgment. For the reasons stated below, both motions are denied.

### BACKGROUND

Coastal's claims originate in January 23, 1992, when Matt Goodman, Commander's Vice President of Sales ("Goodman") telephoned Bruce Dorfman, Coastal's Sales Manager, and told him of Commander's interest in selling its model 114B aircraft ("114B") through a dealership network such as Coastal. Dorfman, enthusiastic about a dealership agreement, provided Goodman with Coastal's record, and the two planned a meeting in New York. Shortly after the phone call, Goodman sent Dorfman Commander's Standard Dealer package, which included copies of Commander's standard dealership agreement, purchase order forms, and detailed product marketing and pricing information.

As planned, on February 17, 1992, Goodman and Dorfman met for breakfast in Rye, New York. At that time, Goodman indicated that Commander was interested in dealership territories in New York, New Jersey, Pennsylvania, Georgia, Alabama and Florida. Later that day, Coastal's President, Rocky Genovese ("Genovese"), met with Goodman. Both meetings focussed on pricing, dealer profit margins and payment terms.

On March 12, 1992, William Morton of Coastal ("Morton"), Genovese and Dorfman travelled to Bethany, Oklahoma to attend the "roll-out" of the new 114B. During their visit, the three met with William Boettger, Commander's President, Richard Smiley, an employee of Commander, and Goodman to discuss the possibility of Coastal's obtaining higher profit margins. After the visit, the parties expressed interest through an exchange of follow-up letters. Goodman's letter indicated available dealership areas in New York, New Jersey, Virginia, Maryland, D.C. North Carolina and South Carolina. Goodman attached customer lists, sales data and profit margins to his letter.

Boettger also wrote a follow-up letter to Morton in which he stated "I have requested [Goodman] to reserve New York and New Jersey until we have finished our discussions." Goodman, without informing Boettger or anyone else at Commander, awarded the territory to a competitor. On March 26, 1992, Morton telephoned Genovese to learn why the New York/New Jersey dealership had been awarded to a competitor. Genovese apologized and expressed interest in doing business with Coastal in the southeastern territories.

On March 27, 1992, Dorfman called Goodman to submit an offer to become a Commander dealer in the Southeastern United States and to purchase a specific number of aircraft over a three year term. The offer was subject to approval of a third partner of Coastal. On March 30, 1992, Goodman wrote a letter to Dorfman in response to the March 27, 1992 phone call. The letter, which twice refers to Dorfman's phone call as an "offer" by Coastal, summarizes Commander's understanding of Coastal's terms:

1) Third partner approval from Coastal

2) Items 11 & 12 reworded pertaining to insurance coverages for the dealer

3) First right of refusal on dealer opportunities north of New York

4) Commander Dealer program and deposit schedule as prescribed

5) 10 aircraft for year one, 20 aircraft for year two, 30 aircraft for year three, for the following marketing territory: MD, D.C. VA, NC, SC, GA, AL and subject to Florida.

Goodman also refers to Dorfman's "offer [as] timely [and] diligent." Significantly, Goodman then addresses the above five terms as follows:

The items in the Dealership contract you reference in regard to paragraphs 11 & 12 pertaining to insurance coverages for the Dealership can be reworded to meet your satisfaction as well as that of Commander Aircraft Company. I have no problem with providing Coastal Aviation right of first refusal should dealership opportunities open in the New England states....

At this time, I would like to propose an alternative program which would give Coastal Aviation the following marketing areas:

> Maryland
>
> D.C.
>
> West Virginia
>
> Virginia
>
> North Carolina
>
> South Carolina
>
> Georgia
>
> Alabama

... The aircraft orders for this area which would be appropriate for Coastal and Commander would be 10 aircraft per year during the term of the agreement ...

I await your reply;

On the morning of April 6, 1992, Dorfman called Goodman and accepted the terms of the March 30, 1992 letter. On April 7, 1992, Morton wrote to Commander, "confirming [Dorfman's] telephone call [and to] accept [the] proposal." On April 8, 1992, DeWitt Beckett, a subordinate of Goodman sent a letter to Morton which did not refer either to Dorfman's April 6, 1992 phone call or to Morton's April 7, 1992 letter but rather proposed new terms for a possible dealership agreement. Morton sent a facsimile to DeWitt that same day which indicated his confusion and reaffirmed that he had already accepted Goodman's original offer of March 30, 1992. Still the same day, DeWitt faxed Morton, saying that "we hereby withdraw the letter of proposal of April 7, 1992, and any and all other communications that may be construed to be proposals." This litigation followed.

## DISCUSSION

### A. Legal Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if:

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Richardson v. Selsky,* 5 F.3d 616, 620 (2d Cir.1993).

The Court's responsibility is to perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *McNeil v. Aguilos,* 831 F.Supp. 1079, 1082 (S.D.N.Y.1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)).

The party seeking summary judgment bears the initial burden of "informing the district court of the basis of its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Upon the movant's satisfying the burden, the onus then shifts to the nonmoving party, which " 'must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *McNeil* 831 F.Supp. at 1082 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam) (other citations omitted)). See also *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991) (citing *Knight v. U.S. Fire Ins.*, 804 F.2d 9 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)) (other citations omitted). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir.1992).

## B. *The Statute of Frauds*

At the heart of this dispute is whether the parties entered into an enforceable contract for the sale of airplanes. Coastal claims that Commander's letter of March 30, 1992 together with its letter of April 7, 1992 is sufficient to form a contract. Commander claims that these letters do not satisfy the statute of frauds as adopted by New York's Uniform Commercial Code (N.Y.U.C.C.) provisions governing the sale of goods.

The relevant provision for determining whether a contract has been formed, N.Y.U.C.C. 2–201(1), requires a writing to be signed by the party to be charged or an authorized agent for enforcement of a contract of a sale of goods for more than five hundred dollars. (McKinney 1964 & 1988 Supp.). The official Comment to § 2–201(1) indicates that a writing will satisfy the statute of frauds if it is signed by the party to be charged, it specifies a quantity and it evidences a contract for sale of goods; See 2 E. Farnsworth, *Farnsworth on Contracts* § 6.7 at 141 (2d ed. 1990) (UCC "significantly relaxes the requirement that the memorandum state all the essential terms by insisting only that it state the quantity of goods"); See also *Bazak International Corp. v. Mast Industries*, 73 N.Y.2d 113, 538 N.Y.S.2d 503, 505, 535 N.E.2d 633, 635 (1989); *N. Dorman & Company*, 501 F.Supp. 294 (E.D.N.Y.1980); *Horn Waterproofing v. Horn Construction*,

104 A.D.2d 851, 480 N.Y.S.2d 367 (2d Dept. 1984).

Turning to the case before us, the first two requirements are easily met. The March 30, 1992 letter bears Goodman's signature, and it specifies ten aircraft per year during the term of the agreement. Thus, the sole issue remaining for resolution is whether the writings, considered as a whole, evidence intent to enter into an enforceable contract for the sale of goods.

Looking to the documents themselves, we believe that there is sufficient evidence to support a claim that a contract was formed as a result of Goodman's letter of March 30, 1992 and Morton's acceptance letter dated April 7, 1992. First, the March 30, 1992 letter thanks Coastal for its "offer", which it characterizes as "timely and diligent." The letter then assents to Coastal's offered price schedule and agrees to modify the Dealership Agreement with respect to insurance coverage. Goodman's agreement to change only one aspect of the Dealership Agreement evidences his intent to be bound by other terms of that agreement. The letter then proceeds to "propose an alternative program" for two substantial, if not essential, elements: territory and quantity. Regarded in this context, we find the letter to be a valid counteroffer which extends to Coastal the power of acceptance. Indeed, the letter closes, "we await your reply."

This letter and Morton's letter of April 7, 1992 which accepts [Commander's] proposal, taken together, constitute a writing sufficient to satisfy the statute of frauds. Of course, this conclusion does not establish as a matter of law that the contract alleged by Coastal was concluded between the parties. Instead, our holding means only that Coastal is not barred from attempting to prove that the parties entered into an official contract. See *Bazak*, 538 N.Y.S.2d at 505, 535 N.E.2d at 635 ("UCC 2–201(2) neither binds the receiving merchant to an agreement it has not made nor delivers an undeserved triumph to the sending merchant. It does no more than permit the sender to proceed with an attempt to prove its allegations.").

## C. *The Merchant's Exception the Statute of Frauds*

 Commander alternatively argues that even if Coastal's writing is sufficient, its letter of April 8, 1992 relieved it of any obligations to Coastal. In support, Commander claims that its letter falls within the "Merchant's Exception" to the statute of Frauds. N.Y.U.C.C. 201–1(2). That section provides:

Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents it satisfies the requirements of subsection (1) against such a party unless written notice of objection to its contents is given within ten days after it is received.

(McKinney 1964 & 1988 Supp.).

This provision, however, is not an element of the statute of frauds but rather provides an alternative to it in the absence of a signed writing. See *Bazak*, 538 N.Y.S.2d at 506, 535 N.E.2d at 636 ("UCC 2–201(1) requires that the writing be 'sufficient to indicate a contract while UCC 2–201(2) calls for a writing in confirmation of a contract.); see also *Apex Oil Company v. Vanguard Oil & Service Co.*, 760 F.2d 417 (2d Cir.1985); *East Europe Domestic International v. Island Creek Coal Sales Company*, 572 F.Supp. 702 (S.D.N.Y. 1983); *Sen Mar, Inc. v. Tiger Petroleum*, 774 F.Supp. 879, 883 (S.D.N.Y.1991). Because we find that the March 30, 1992 counteroffer and the April 7, 1992 acceptance satisfy UCC 2–201(1), the Merchant's exception is inapplicable.

## D. *Plaintiff's Cross Motion*

Coastal contends that Boettger's March 19, 1992 letter to Morton in which he states that "he has requested [Goodman] to reserve the New York/New Jersey territory" created a contract in the form of an option agreement. Plaintiff's papers are insufficient to support a motion for summary judgment, and it is therefore denied.

## *CONCLUSION*

For the foregoing reasons, Defendants' motion for summary judgment and plaintiff's cross-motion for summary judgment are denied.

**SO ORDERED.**