**COASTAL AVIATION, INC., Plaintiff,**

v.

**COMMANDER AIRCRAFT COMPANY,
Defendant.**

**No. 92 Civ. 4229 (WCC).**

United States District Court,
S.D. New York.

Aug. 28, 1996.

Law Offices of John A. Tartaglia, White Plains, NY (John A. Tartaglia, of counsel), for Plaintiff.

Peckar & Abramson, P.C., New York City (Charles E. Williams, III, of counsel), for Defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Coastal Aviation Incorporated ("Coastal") brings this action against defendant Commander Aircraft Company ("Commander"), seeking $5,319,424 in damages arising out of an alleged breach of a contract for Coastal's exclusive dealership rights to sell Commander airplanes. This court conducted a two-day bench trial on May 21–22, 1996. This opinion constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). For reasons discussed below, we enter judgment in favor of defendant on all claims.

### FINDINGS OF FACT

Plaintiff Coastal is a Connecticut corporation formed in 1985, with its principal place of business in Rye, New York, and is equally owned by three private investors, Rocco Genovese ("Genovese"), President; Kurt F. Ostheimer ("Ostheimer"), Vice President and Secretary; and William H. Morton ("Morton"), Vice President and Treasurer. Coastal was formed to serve as a distributor of aircraft manufactured by Aerospatiale General Aviation ("Aerospatiale"), a subsidiary of Socata S.A., a French corporation. Coastal has one salaried employee, Bruce Dorfman ("Dorfman"), Director of Sales and Marketing.

Coastal's initial distributorship territory for Aerospatiale included New York, New Jersey, Massachusetts, Rhode Island, Vermont, New Hampshire and Maine. Tr. 36. This territory was later expanded to include Florida, Georgia and Alabama. Id.[1] Coastal represented Aerospatiale in these ten states through its association with general aviation dealers. Coastal would pass on initial leads of potential purchasers of Aerospatiale aircraft to the local dealer. The dealer would then follow-up the leads, and Coastal would help secure final sales. On this basis, Coastal and the dealer would share commissions.

Defendant Commander, a public corporation, was incorporated in Virginia in 1988, and has a principal place of business in Bethany, Oklahoma. Commander manufactures, markets and provides support services for single-engine, high-performance aircraft. The original Commander aircraft, the Commander 112, was designed by the General Aviation Division of Rockwell International Corporation ("Rockwell") and received Federal Aviation Administration ("FAA") approval in 1972. The Model 114 was certified in 1976 and the 114A in 1979. From 1972 to 1979, over 1,100 Model 112/114s were produced. Production was discontinued in 1979. In 1981 Rockwell sold its entire General Aviation Division to Gulfstream Aerospace Corporation. In 1985, Chrysler acquired Gulfstream Aerospace Corporation. In 1988, Chrysler/Gulfstream sold the single-engine 112/114 product line to newly formed Commander. The assets acquired by Commander included the Rockwell 112/114 design data and FAA type certificates, production tooling to fabricate and assemble the 112/114 products, and a considerable inventory of fabricated and purchased parts suitable for spares and/or new aircraft production.

Coastal accounted for between 25% and 50% of Aerospatiale's total United States sales of aviation products from 1988 to 1992, making it the largest Aerospatiale dealer of aviation products in the United States during those years. Tr. 10. Coastal sold basically two Aerospatiale models—the Trinidad and the Tobago. Tr. 15. The Trinidad was a

---

1. At some point, Coastal's Aerospatiale territory consisted of New York, New Jersey, Georgia, Alabama, Florida and Pennsylvania, with affiliations in North Carolina, South Carolina, Maryland, Virginia and the District of Columbia. *See* Pl.'s ex. 4; Tr. 150–151.

single-engine, four-place, retractable-gear, low-wing model with a top speed of about 200 miles per hour, and in 1992 typically sold for $260,000 to $270,000. Tr. 16. The Tobago, a fixed landing gear model, sold for $125,000 to $150,000. *Id.*

Commander's first new production model, the 114B, like the Trinidad model TB–20, was a single-engine, four-place, retractable-gear, low-wing aircraft, with a cruising speed of 184 miles per hour. The 114B was targeted slightly below the TB–20 in price. The TB–20 came in a turbo-charged version, called the TB–21. A comparable turbo-charged version of the 114B was in its developmental stage in 1992. Coastal sold six new Trinidads in 1989; ten in 1990; seven in 1991; and two in 1992. Def. ex. A.[2]

According to Genovese, the 114B offered several advantageous features that were lacking in the Trinidad. For example, the 114B had more head room and allowed easier entry and exit. Tr. 21. Also, the price of the 114B was less than that of the Trinidad. Tr. 23, 75–77. Although it was not quite as fast, it had a superior finish on the outside and superior styling inside. *Id.* From a marketing standpoint, the 114B's American origin was appealing because of the perceived trend of Americans spending more money on domestic products. Tr. 23–24. On the other hand, the Trinidad had longer range, and more cabin width—albeit at the sacrifice of cabin height. Tr. 33.

The parties in this action had their introduction at least as early as 1989. Dorfman and the principals of Coastal frequently saw Matt Goodman, Commander's Vice President of Sales ("Goodman"), at various industry trade shows, such as the National Business Aircraft Association Convention. Tr. 17, 108. At that time, product liability was a big problem in the general aviation business, and, according to Genovese, many said that it was product liability which had stifled the aviation industry. *See* Tr. 17, 109. In reaction to the product liability problem, Goodman had supported the idea of leasing aircraft in an attempt to shelter Commander

from such liability. Tr. 17, 109–110. Accordingly, in 1989, Goodman contacted Coastal with a product brochure and an outline of a lease proposal. Coastal was immediately interested in Commander's product.

Commander received FAA approval to manufacture and sell its newly designed 114B on May 4, 1992. By this time, Commander had worked out its liability concerns, and, rather than leasing, began recruiting dealers to sell the new aircraft. *See* Tr. 111.

Coastal's claims against Commander arise out of this recruiting effort. On January 23, 1992 Goodman contacted Dorfman, expressing Commander's interest in selling, rather than leasing, its model 114B aircraft through a dealership network such as Coastal. Dorfman, enthusiastic about a dealership involving Commander 114Bs, provided Goodman with Coastal's record, and the two planned a meeting in New York. Shortly after the phone call, Goodman sent Dorfman Commander's standard form dealership agreement ("Dealership Agreement") and the Commander dealer policy and procedures ("Procedures"), which contained the terms and conditions pursuant to which Commander would grant dealerships to sell 114Bs. *See* Pl. ex. 1. Subsection 1.1 of the Dealership Agreement requires that the prospective dealer satisfy the provisions of the Procedures, pay a non-refundable $100 dealership fee, and execute and deliver the Dealership Agreement to Commander before a contract would be formed. Section 14.1 of the Dealership Agreement provides that the term of the Dealership Agreement is for three years, and section 14.2 of the Dealership Agreement provides that either party may terminate the Dealership Agreement, without cause, at any time after the eighteenth month of the term upon 30–days notice.

As planned, on February 17, 1992, Goodman and Dorfman met for breakfast in Rye, New York. At that time, Dorfman indicated that Coastal was interested in dealership territories in New York, New Jersey, Pennsylvania, Georgia, Alabama and Florida. Later that day, Genovese met with Goodman.

---

**2.** Included in the sales figures are a number of the turbo-charged version of the TB–20, noted as the TB–21.

Both meetings focussed on territory, pricing, dealer profit margins and payment terms. *See* Tr. 112–115. The parties discussed a retail price of $169,500 for the base aircraft. Tr. 112. Dorfman expressed some concern over Commander's 15% dealer discount, Tr. 115, which was significantly lower than the 22.5% discount Coastal received on the sale of aircraft manufactured by Aerospatiale. As for territory, Goodman told Dorfman that Montana, North Carolina, California, Arizona, Texas, Kansas, Louisiana, Ohio, Massachusetts, Oregon and Florida were available. Tr. 114. Dorfman expressed interest in two territories: (1) New York, New Jersey and Pennsylvania and (2) Georgia, Alabama, Florida, Maryland and Virginia. Tr. 115–116. The parties agreed that ten aircraft per territory per year was a realistic sales target. Tr. 115–116.

On March 12, 1992, Morton, Genovese and Dorfman travelled to Commander's production facility in Bethany, Oklahoma to attend the "roll-out" of the 114B. *See* Tr. 122–127. During their visit, the three met with Commander's President, William Boettger ("Boettger") and Goodman to discuss terms of a possible agreement, with Coastal seeking higher profit margins than those that were discussed at the February 1992 meeting in Rye, New York. Tr. 38, 40, 125, 258. Coastal deemed it very important to convince Commander to increase the dealer discount margin beyond the 15% previously discussed with Dorfman. *See* Tr. 39, 125. Coastal introduced the idea of using deferred letters of credit ("LCs") to increase the effective dealer margin without increasing the 15% nominal margin stated in the Dealership Agreement. Tr. 40, 70, 125. As Genovese described, Coastal tried to "get a dollar value some other way that would equate to ... margin." Tr. 40. Deferred LCs provided the advantage of allowing Coastal to take delivery of an airplane as a floor model or a demonstration model to enhance marketing,

while deferring payment obligations until some time after delivery. Tr. 88, 92–93, 118. Coastal had used this technique successfully with Aerospatiale, and hoped to repeat it with Commander. Tr. 91. Coastal had been able to squeeze additional margin out of its relationship with Aerospatiale also by performing its own avionic upgrades. Tr. 231.[3]

After the visit, Morton sent a follow-up letter dated March 18, 1992 to Boettger expressing interest in selling and supporting the 114Bs. *See* Pl. ex. 4. In particular, Morton expressed an interest in dealerships in areas where Coastal already sold (through formal or informal relationships with local dealers) Aerospatiale aircraft:

> [O]ur interest would be in the states of New York, New Jersey, Pennsylvania, North Carolina, South Carolina, Georgia, Alabama and Florida. These are territories we currently work for the sale of new Aerospatiale General Aviation aircraft. Our unique showroom/sales representatives/service center systems of marketing has proven itself in the dynamics of current market demands. We believe this infrastructure could provide immediate sales of Commander Aircraft at a critical time in your growth.

*Id.*

In response, Boettger sent a letter to Morton dated March 19, 1992, addressing the territories suggested by Morton in his letter and gross margin discounts discussed earlier at the roll-out:

> We have given considerable thought to your concerns about marketing margins sufficient to make the program work. Believe me when I say the margins for 1992 are the best compromise we can offer and we still have a big job in manufacturing to achieve our internal gross margin target. Our intent is to increase the marketing margins as fast as we can and we have committed to 1% per year for the next 5

---

**3.** Dorfman described avionic upgrades as a source of improving margin as follows:

> It was the same radio ... whether or not we bought that radio from Commander or we bought it from an avionics shop that we worked with, and if we paid the same cost as Commander did for that product.

> Obviously, Commander would mark it up to increase their profit. If we could have that extra spread, that would be a way of improving our margin. It would effectively eliminate the middleman on those components.

Tr. 233.

years. If we can move faster we will. Much of that decision hinges on our cost control and the market acceptance of the 114B.

We should get a good feel for what our 1993 price can be this Summer. Our plan is to set 1993 prices and dealer margins before 10/1/92.

[I] hope you can accept our dealer program for 1992 for what it can be in the future. We need strong dealers to achieve our full sales potential, then we can all make a good profit from the 114B. I know [Goodman] would like to have Coastal covering much of the area of interest to you. We already have commitments for Florida and Pennsylvania. I have requested [Goodman] to reserve New York and New Jersey for Coastal until we have finished our discussions.

I will be focusing on finishing up the Type Certificate details and delivery of the first airplane the next two weeks. After that, I will be available to meet with you, glean all the constructive criticism you have, and establish a Commander territory for Coastal.

Pl. ex. 5.

While Boettger and Morton were exchanging letters, Dorfman and Goodman were engaged in their own discussions. On March 19, 1992, Dorfman initiated a call to Goodman to see if Commander had reached a decision regarding an amendment to the dealer deposit requirement in the Dealership Agreement, and utilizing deferred LCs. Tr. 129. Goodman was not able to give Dorfman a definitive answer, Tr. 129–130, but in following-up on the phone conversation, Goodman sent a letter dated March 23, 1992 to Dorfman, in which he discussed alternatives to Commander's dealer deposit and payment schedule requirement:

I have had an opportunity since our last conversation to meet with Mr. Bill Boettger and members of our Executive board concerning the possible structuring of a delayed payment program for Coastal as outlined utilizing time generated letters of Credit for aircraft purchases. Unfortunately, it does not appear that this concept of aircraft payment plan will fit our requirements at this time for the Dealer program. I am sure you can understand the need for our Dealer deposit and aircraft payment schedule as established to meet our needs during this start-up production period.

Nevertheless, I want to reiterate our sincerity in forming a mutually beneficial arrangement with Coastal for the Dealership areas which would maximize your profit potential considering the business structure which you already have in place. I hope you are able to reconsider the impact of our Dealership program on your current business plan, and that the addition of the Commander Aircraft product line would become a valuable asset to your operation. We will perform according to the Dealer Policy and Procedures as previously outlined and work toward a common goal of spreading Dealer margins as soon as market share of the Commander 114B permits. Current marketing areas available and of interest to you are: New York, New Jersey, Virginia, Maryland[,] D.C., North Carolina, South Carolina, Georgia, and Alabama. We would welcome the input from Coastal and anticipate the Commander marketing segment of your Dealership would grow along with the Commander Aircraft Company marketing plan.

Pl. ex. 6. After receiving this letter, Dorfman called Goodman, and expressed disappointment with the fact that deferred LCs would not be available. Tr. 132–133. Goodman responded that Coastal might be able to increase its effective margin with the ten percent parts override and upgrades. Tr. 133. Also, Goodman informed Dorfman that the Florida territory was being given to Diversified Aircraft Sales ("Diversified"), a competitor. Tr. 132.

After Boettger's follow-up letter to Morton in which he stated "I have requested [Goodman] to reserve New York and New Jersey for Coastal until we have finished our discussions," see Pl. ex. 5, on March 25, 1992, Goodman, without informing Boettger or anyone else at Commander, awarded New York and New Jersey (the "New York Area") and Pennsylvania to a competitor, Braden's Flying Service ("Braden's"). See

Tr. 139–143. On March 26, 1992, Goodman telephoned Dorfman to let him know that Commander had awarded this territory to Braden's. Tr. 139; Pl. ex. 3. Though upset about losing the New York Area, Dorfman inquired again about Florida. Tr. 143. Goodman confirmed that Florida had been committed to Diversified. Tr. 143.

That same day, Morton telephoned Boettger to learn why the New York Area dealership had been awarded to Braden's. Tr. 269. Boettger apologized and expressed interest in doing business with Coastal in the remaining states (and the District of Columbia) in the southeast—Virginia, Maryland, District of Columbia, North Carolina, South Carolina, Georgia and Alabama.

On March 27, 1992, Dorfman called Goodman to submit an offer to become a Commander dealer in the southeast United States. Dorfman told Goodman that Coastal was prepared to make an offer for Florida, Georgia, Alabama, North Carolina, South Carolina, Virginia and West Virginia, and that Coastal would commit to take 10 aircraft in the first year, 20 in the second, and 30 in the third. Tr. 144. Goodman agreed to discuss the offer with Commander. Tr. 145.

On March 30, 1992, Goodman wrote a letter to Dorfman in response to the March 27, 1992 phone call. *See* Pl. ex. 8. The letter stated that the offer was subject to approval of a third partner of Coastal, i.e., Ostheimer. According to Genovese, Ostheimer's role was "very, very important" because his expertise was insurance and finance, and liability was a "key ... deterrent in ... general aviation." Tr. 36. The letter summarized Commander's understanding of Coastal's potential offer:

1) Third partner approval from Coastal

2) Items 11 & 12, pertaining to insurance coverage for the dealer, reworded

3) First right of refusal on dealer opportunities north of New York

4) Commander Dealer program and deposit schedule as prescribed

5) 10 aircraft for year one, 20 aircraft for year two, 30 aircraft for year three, for the following marketing territory: MD, D.C., VA, NC, SC, GA, AL and subject to Florida.

Pl. ex. 8. Goodman then addressed the above five terms as follows:

I believe the items in the Dealership contract you reference in regard to paragraphs 11 & 12 pertaining to insurance coverage for the Dealership can be reworded to meet your satisfaction as well as that of Commander Aircraft Company. I have no problem with providing Coastal Aviation right of first refusal should dealership opportunities open in the New England States to the north of your location in Rye, New York.

The agreement with Diversified Aircraft Sales is complete for the marketing area of Florida. I know that this area is a very strong presence for your company and a vital marketing area to perfect the flow of product through your organization.

At this time, I would like to propose an alternative program which would give Coastal Aviation the following marketing areas:

Maryland

D.C.

West Virginia

Virginia

North Carolina

South Carolina

Georgia

Alabama

[T]he aircraft orders for this area which would be appropriate for Coastal and Commander would be 10 aircraft per year during the term of the agreement.

I look forward to working with you, and sincerely hope that we may still lay a viable framework from around which Coast[al] Aviation may effectively market the Commander product line even without the marketing area of Florida.

I await your reply....

*Id.* "Third partner approval from Coastal," meant approval by Ostheimer. *See* Tr. 147. "Items 11 & 12 ... reworded" pertained to insurance coverage for the dealer. Tr. 147. Coastal had been concerned that the Dealership Agreement was worded so that once an aircraft was manufactured by Commander and sold to Coastal, and then delivered to a

customer, Coastal might be construed to be indemnifying the manufacturer from product liability. Tr. 147.

On the morning of April 6, 1992, while at a trade show in Florida, Dorfman called Goodman and attempted to accept the terms of the March 30, 1992 letter. Tr. 97, 223, 225. (Dorfman had expected to meet Goodman in person at the trade show to accept his purported offer of March 30, 1992, but Goodman did not attend. Tr. 225.) Dorfman testified that Goodman responded that he would call Coastal and arrange to come up the following week to bring all the documents and receive deposits for aircraft. Tr. 226. Apparently, on April 6, 1992, someone from Commander left a message with Morton regarding a problem with the purported offer. Tr. 281. Morton attempted to get in touch with Boettger, but to no avail. See Tr. 97–99, 278, 282. On April 7, 1992, Morton wrote to Commander, "[c]onfirming ... Dorfman's telephone call [and to] accept [the] proposal." See Pl. ex. 9; Tr. 282. Morton reiterated an interest in Florida, New York, New Jersey and other parts of New England, but was willing to accept a deal involving the states (and the District of Columbia) listed in Goodman's letter dated March 30, 1992 (the "Southeast Territory"):

> In referencing your letter, our territory is to include the states of Alabama, Georgia, South Carolina, North Carolina, Virginia, West Virginia, D.C. and Maryland. As you request, we accept this proposal as demonstration of "Good Faith" in the interest of building upon our longer term relationship. To this end, we are hopeful in being able to add (at some future date) the additional states as previously discussed [sic] with you, Bill Boettger and restated in the above paragraph.
>
> After considerable expenditure of both time and money in working with your organization, we are pleased to now be a viable part of your "Marketing Department."

Pl. ex. 9.

That same day, on April 7, 1992, DeWitt Beckett ("Beckett"), a subordinate of Goodman, sent a letter to Morton, but did not refer either to Dorfman's April 6, 1992 phone call or to Morton's April 7, 1992 letter, and instead proposed new terms for a possible dealership agreement. This letter reads in relevant part as follows:

> As Director of Dealer Placement and Domestic Sales, it comes to my attention of your desire to pursue a Dealership for the Commander 114B. I am cognizant of past conversations and communications with Matt Goodman and Mr. Boettger, and am apologetic that I, personally have not communicated with you directly until this time. . . .
>
> [Y]our presence in New York, Georgia, and Florida under other circumstances would have been a great benefit in the entire marketing effort and Dealer Network that I am trying to establish as a viable organization for the long term. As the situation stands at this time, all of the areas of your primary interest and actual physical presence are under contract with other entities.
>
> In an effort to involve your organization in the sales of the Commander 114B the following is a proposal for your consideration and review. . . .
>
> THE MARKET AREA FOR CONSIDERATION:
>
> The states of Maryland, Virginia, West Virginia, North Carolina, and South Carolina, and the District of Columbia.
>
> NUMBER OF AIRCRAFT FOR THE TERM OF THE AGREEMENT: Year One—six (6); Year Two—eight (8); Year Three—ten (10).
>
> ESTABLISHMENT OF PHYSICAL PRESENCE:
>
> A staffed sales office located strategically in the territory. (A location such a[s] Raleigh, NC would be considered ideal.)
>
> RECIPROCAL ARRANGEMENT WITH TANGENT AREAS:
>
> It is recommended that an arrangement be made between dealers in the tangent marketing areas to share retail leads that you may have generated in your other sales offices in those areas, so that all dealers may take advantage of the demand for 114Bs.
>
> More specifically, this marketing area is available at this time, April 7, 1992, and

will remain open for your consideration only for the next seven days, which will bring us to April 14, 1992. I will consider this marketing area under a letter of intent until that time or your decline to consider this on the above basis.

Pl. ex. 10.

Morton sent a facsimile to Beckett that same day indicating his confusion, and reaffirmed that he had already accepted Goodman's original offer of March 30, 1992:

> We are puzzled by your recent communication dated April 7, 1992 ... as we have already agreed to accept Commander Aircraft's proposal as outlined in Mat Goodman's letter of March 30, 1992.... [W]e previously had been under the impression from correspondence received from Mr. Bill Boettger on March 19, 1992 that the territories of New York and New Jersey were to be reserved for Coastal "until we had finished our discussions."
>
> Obviously, we were shocked to learn New York and New Jersey were given to someone else....
>
> In trying to overcome the loss of New York and New Jersey we made a proposal that included the states of Alabama, Georgia, South Carolina, North Carolina, Virginia, West Virginia, D.C., Maryland and Florida. Mat Goodman responded in writing offering us the above states, excluding Florida. His letter stated he would "await our reply." Within five (5) business days we accepted this offer—and have done so in writing. Please note our response falls well within the time limit you placed upon your recent suggestion, although Mr. Goodman's letter of March 30, 1992 had no such stipulation.
>
> We await notification as to when we will be receiving related paperwork and first aircraft.

Pl. ex. 11.

The following day, Beckett faxed Morton, stating as follows:

> In view of the communications of recent receipt it appears that you construed Mr. Goodman's conversation with Mr. Dorfman as an acceptance of a letter proposal of March 30, 1992. In fact, Mr. Goodman

stated that "he didn't see why it wouldn't work, but I will know better after our meeting this morning." The meeting produced the signed contracts for the Georgia, Alabama area that I personally had negotiated and consummated during the previous number of days. Your office was notified immediately upon the evidence of those contracts including all of the areas that you had inquired about....

> With further review of the situation, the communications, and the intent of all parties concerned, we hereby withdraw the letter of proposal of April 7, 1992, and any and all other communications that may be construed to be proposals. I do not believe that further pursuit of a dealership program with Coastal's involvement would be beneficial to Coastal or Commander under present circumstances....

Pl. ex. 12. This litigation followed. *See* Pl. ex. 13.

In the first eighteen months following the alleged breach, twelve new 114Bs were sold in the United States by Commander and its distributors. Def. ex. V1. Of these, two were sold in the territories sought by Coastal (both in Maryland). *Id.* At trial, Coastal sought to prove damages of lost profits through expert testimony from Walter L. Zweifler ("Zweifler"), an economist/appraiser and Richard Lomas ("Lomas"), an accountant/attorney. *See* Tr. 171–222; Pl. ex. 14 ("Zweifler Report"); Tr. 300–312; Pl. ex. 34 ("Lomas Report"). Zweifler testified that Coastal suffered $1,350,000 in damages due to the loss of the New York Area franchise, and $1,350,000 for the loss of the Southeast Territory franchise. Lomas testified that Coastal suffered $1,156,440 in damages in lost profits from Commander's breach of contract to sell 114Bs for the Southeast Territory, and $809,508 in lost profits from Commander's breach of an option contract for the New York Area.

### CONCLUSIONS OF LAW

■ A federal court sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Rogers v.*

*Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989). In New York, choice of law issues involving contractual disputes are governed by an "interest analysis." *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 137 (2d Cir.1991). " '[T]he law of the jurisdiction having the greatest interest in the litigation' controls." *Id.* (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 581–82 (1969)). In performing this analysis, a court should look to factors such as the place of (1) contracting, (2) negotiation of the contract, (3) performance, (4) the location of the subject matter of the contract, and (5) domicile, residence, nationality, place of incorporation, and place of business of the parties. *Wm. Passalacqua Builders,* 933 F.2d at 137. *See also State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld,* 921 F.2d 409, 417 (2d Cir. 1990). In the instant case, both parties have assumed that New York law governs, as evidenced, for example, by reliance on New York law to support their respective contentions. *Wm. Passalacqua Builders,* 933 F.2d at 137. *See also Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir.1984) (under New York law, "in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied."); *M.H. Segan Ltd. Partnership v. Hasbro, Inc.,* 924 F.Supp. 512, 522 (S.D.N.Y.1996) (same). We likewise assume that New York law governs this dispute.

Plaintiff Coastal asserts two breach of contract claims: (1) breach of an option contract for the sale of aircraft for the New York Area and (2) breach of a contract for the sale of aircraft for the Southeast Territory. Coastal seeks damages in lost profits for these purported breaches. In addition, Coastal seeks reimbursement for out-of-pocket expenses incurred when its officers travelled to the roll-out in Bethany, Oklahoma. *See* Pl. ex. 15.[4] At trial, Coastal submitted letters that were transmitted between the parties during negotiations. In addition, officers of Coastal testified regarding oral and written communications and ne-

gotiations that had taken place between the parties. Finally, Coastal produced two experts (Zweifler and Lomas) who testified as to the amount of damages suffered as a result of the purported breaches. Defendant Commander cross-examined Coastal's witnesses, but produced no witnesses of its own. Commander maintains that Coastal has failed to prove that there was either an option contract for the New York Area or that there was a contract for the Southeast Territory. Commander also argues that, even assuming that Coastal has proved there was a contract for either or both of these areas, Coastal has failed to prove damages with the requisite level of certainty to recover under New York law.

## I. CONTRACT FORMATION

■ To succeed in a breach of contract claim, four elements must be satisfied: the making of a contract, performance of the contract by the plaintiff, breach of the contract by the defendant, and damages suffered by the plaintiff. *Machine–Outils Henri Line, Ltee v. Morey Machinery, Inc.,* 1996 WL 254863, at *6 (S.D.N.Y. May 14, 1996) (citing *John Hancock Property and Cas. Ins. Co. v. Universale Reinsurance Co.,* 147 F.R.D. 40, 46 (S.D.N.Y.1993)); *Van Brunt v. Rauschenberg,* 799 F.Supp. 1467, 1470 (S.D.N.Y.1992). Commander challenges the first and fourth elements in this action.

Basic principles of contract law and Article 2 of the Uniform Commercial Code ("UCC") as adopted by New York govern because the overall contract as alleged was predominantly for the sale and delivery of goods. *See Long Island Lighting Co. v. Imo Indus.,* 6 F.3d 876, 887–88 (2d Cir.1993); *Triangle Underwriters, Inc. v. Honeywell, Inc.,* 604 F.2d 737, 742–43 (2d Cir.1979); *Machine–Outils,* 1996 WL 254863, at *6; *St. Anne–Nackawic Pulp Co. v. Research–Cottrell, Inc.,* 788 F.Supp. 729, 734 (S.D.N.Y.1992).

### A. THE NEW YORK AREA OPTION

We first address Coastal's claim that Commander granted it an option for the New York Area. Coastal rests this claim on Bo-

---

4. Notably, Coastal asserts no other claims or theories for recovering damages.

ettger's March 19, 1992 letter indicating that Boettger had requested Goodman to reserve the New York Area for Coastal during the pendency of their negotiations. *See* Pl. ex. 5 ("I have requested [Goodman] to reserve New York and New Jersey for Coastal until we have finished our discussions.").

■ " 'An option contract is an agreement to hold an offer open; it confers upon the optionee, for consideration paid, the right to purchase at a later date.' " *Kaplan v. Lippman,* 75 N.Y.2d 320, 552 N.Y.S.2d 903, 905, 552 N.E.2d 151, 153 (1990) (quoting *Leonard v. Ickovic,* 79 A.D.2d 603, 433 N.Y.S.2d 499, 500 (1980), *aff'd,* 55 N.Y.2d 727, 447 N.Y.S.2d 153, 431 N.E.2d 638 (1981)). Coastal has neither alleged nor argued that any consideration was paid for this purported option.

However, under New York law, a "firm offer" by a merchant can create an option contract enforceable against the merchant by the offeree, even in the absence of consideration:

An offer by a merchant to buy or sell goods in a signed writing which by its terms gives assurance that it will be held open is not revocable, for lack of consideration, during the time stated or if no time is stated for a reasonable time, but in no event may such period of irrevocability exceed three months; but any such term of assurance on a form supplied by the offeree must be separately signed by the offeror.

N.Y.U.C.C. § 2–205 (McKinney 1993).[5] Based on this section, Coastal argues that Boettger's letter of March 19, 1992 creates a binding option contract under New York law in favor of Coastal. We disagree.

■ In order to establish an option under the merchant's firm offer rule, there must be an "*offer* by a merchant to buy or sell goods in a signed writing which by its terms gives

assurance that it will be held open." N.Y.U.C.C. § 2–205 (McKinney 1993) (emphasis added); *see also* N.Y.Gen.Oblig.Law § 5–1109 (McKinney 1989). Boettger's letter of March 19, 1992 is devoid of any offer within the meaning of section 2–205. Rather, Boettger relays a statement about a communication that occurred between him and Goodman. In so doing, Boettger merely expresses his willingness to reserve the New York Area for future discussions with Coastal in hopes of reaching an agreement for a dealership in that area. He conveys no assurance that the New York Area will be available, nor a commitment on the part of Commander to reserve the New York Area for Coastal. An enforceable legal right cannot arise in contract without the expression of mutual consent to be bound. *Teachers Ins. and Annuity Assoc. of America v. Tribune Co.,* 670 F.Supp. 491, 497 (S.D.N.Y.1987) (Leval, J.). We conclude that his statement does not evince an intent to be bound by a promise to hold the New York Area open for Coastal. Nor can Coastal argue that it reasonably relied on this statement to its detriment or suffered any damages as a result of Boettger's statement that he had asked Goodman to reserve the New York Area for negotiations with Coastal. As such, we conclude that the evidence fails to establish the existence of an option for the sale of aircraft for a New York Area dealership.

## B. THE SOUTHEAST TERRITORY

As for Coastal's second claim, Commander asserts that Coastal's failure to execute the standard form Dealership Agreement and abide by the Procedures bars its breach of contract claim for the Southeast Territory. Under the New York statute of frauds, a contract for the sale of goods for the price of $500 or more is not enforceable "unless there

---

**5.** New York General Obligations Law contains a similar provision for contracts falling outside section 2–205 of the New York Uniform Commercial Code:

Except as provided in section 2–205 of the uniform commercial code with respect to an offer by a merchant to buy or sell goods, when an offer to enter into a contract is made in a writing signed by the offeror, or by his agent, which states that the offer is irrevocable during

a period set forth or until a time fixed, the offer shall not be revocable during such period or until such time because of the absence of consideration for the assurance of irrevocability. When such a writing states that the offer is irrevocable but does not state any period or time of irrevocability, it shall be construed to state that the offer is irrevocable for a reasonable time.

N.Y.Gen.Oblig.Law § 5–1109 (McKinney 1989).

is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." N.Y.U.C.C. § 2–201(1) (McKinney 1993). That section further provides that the only indispensable term in such a writing is quantity. *Bazak Int'l Corp. v. Mast Indus.*, 73 N.Y.2d 113, 538 N.Y.S.2d 503, 505, 535 N.E.2d 633, 634–635 (1989).

Coastal claims that Goodman's March 30, 1992 letter constitutes a written offer for the sale of ten Commander aircraft per year during the term of the agreement. Furthermore, Coastal asserts that Dorfman accepted this offer in an April 6, 1992 telephone conversation with Goodman, and the acceptance was confirmed by Coastal in a follow-up letter from Morton dated April 7, 1992. Addressing Commander's statute of frauds defense, Judge Parker held earlier that Goodman's March 30, 1992 letter and Morton's April 7, 1992 letter presented "sufficient evidence to support a claim that a contract was formed." *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 903 F.Supp. 591, 594 (S.D.N.Y.1995). That holding "[did] not establish as a matter of law that the contract alleged by Coastal was concluded between the parties. Instead, [the] holding mean[t] only that Coastal [was] not barred from attempting to prove that the parties entered into an official contract." *Id.* Coastal was thus permitted to try and prove its claim that a contract was executed between the parties for the Southeast Territory. As the Second Circuit has articulated, the intention of the parties controls contract formation:

> First, if the parties intended not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and second, the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.

*Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.1984) (citing *V'Soske v. Barwick*, 404 F.2d 495 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969)), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). In *Tribune*, Judge Leval considered whether the intent to be bound was revealed by (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions. 670 F.Supp. at 499–503. *See also Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989).

█ Upon review of testimony given at trial and evidence submitted by the parties, we now conclude that Goodman's letter of March 30, 1992, when viewed in light of the surrounding circumstances of this case, including the past dealings of the parties, does not manifest an intent to enter into a binding agreement, and therefore did not constitute an offer. Indeed, "[c]ourts must be particularly careful to avoid imposing liability where binding obligation was not intended." *Tribune*, 670 F.Supp. at 499. " '[A] primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended.' " *Arcadian Phosphates*, 884 F.2d at 72 (quoting *Tribune*, 670 F.Supp. at 497). Although the Second Circuit has recognized that even informal agreements can be binding if the parties "merely contemplate[d] that their informal agreement would be reduced to a formal writing …," *Reprosystem*, 727 F.2d at 261, such is not the case here. Prior to March 30, 1992, there were discussions and negotiations concerning various issues in the Dealership Agreement, including insurance arrangements and gross margin discounts. While price is not an essential element in the formation of a contract for the sale of goods, N.Y.U.C.C. § 2–201(1) (McKinney 1993); *Bazak*, 538 N.Y.S.2d at 505, 535 N.E.2d at 634–35, pricing was a particularly important issue, and there is no evidence that the parties had agreed upon a dealer discount. Furthermore, the insurance arrangement in the Dealership Agreement was a hurdle that was never overcome during negotiations. Indeed, Goodman begins his March 30, 1992 letter by stating the conditions subject to which a Dealership

Agreement could be executed. Although this letter did not expressly call for execution of the Dealership Agreement as a prerequisite to entering into a binding contract, Coastal should have known that it could not enter Commander's distributorship network without executing a Dealership Agreement. We conclude that Goodman's March 30, 1992 letter, especially when viewed in the context of the history of the negotiations between the parties, does not manifest an intent to enter into a binding agreement with Coastal. Although the omission of an important term or terms does not necessarily prevent a contract from arising, when the parties' actions manifest a lack of intent to contract, which we find to be the case here, no contract results.

Indeed, as soon as Coastal attempted to accept this purported offer, Commander immediately responded in writing to clarify that the March 30, 1992 letter was not a firm offer to sell aircraft to Coastal. *See* Pl. ex. 10. Therefore, even under the merchant's exception to the statute of frauds, *see* N.Y.U.C.C. § 2–201(2) (McKinney 1993), Coastal has failed to prove the existence of a contract. Because of Commander's immediate response, Coastal could not have incurred any expenses in reliance on its own April 7, 1992 letter of "confirmation" which otherwise might have bound Commander pursuant to section 2–201(2).

## II. DAMAGES

Coastal seeks damages in lost profits for Commander's failure to grant distributorships for the sale of 114Bs in the New York Area and the Southeast Territory. Even assuming that Commander breached either or both of these purported contracts, Coastal still would not be able to recover because it has failed to prove damages with the requisite level of certainty under New York law.

The damage provisions applicable to this case are sections 2–713(1) and 2–715(2)(a) of the UCC. Section 2–713 reads in pertinent part as follows:

(1) [T]he measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach

and the contract price together with any incidental and consequential damages provided in [§ 2–715], but less expenses saved in consequence of the seller's breach.

N.Y.U.C.C. § 2–713(1) (McKinney 1993). Consequential damages are defined in section 2–715 as follows:

(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise....

N.Y.U.C.C. § 2–715(2) (McKinney 1993). "Lost profits" are recoverable as consequential damages under sections 2–713 and 2–715. *See Jewell–Rung Agency, Inc. v. Haddad Organization, Ltd.*, 814 F.Supp. 337, 340–42 (S.D.N.Y.1993); *Texpor Traders, Inc. v. Trust Co. Bank*, 720 F.Supp. 1100, 1113 (S.D.N.Y.1989); *Larsen v. A.C. Carpenter, Inc.*, 620 F.Supp. 1084, 1131 (E.D.N.Y.1985), *aff'd*, 800 F.2d 1128 (2d Cir.1986); *Bende and Sons, Inc. v. Crown Recreation, Inc., Kiffe Products Div.*, 548 F.Supp. 1018, 1022 (E.D.N.Y.1982), *aff'd*, 722 F.2d 727 (2d Cir. 1983); *Harbor Hill Lithographing Corp. v. Dittler Bros., Inc.*, 76 Misc.2d 145, 348 N.Y.S.2d 920, 923–24 (Sup.Ct.1973).

Although lost profits may be recovered as consequential damages under New York law, a calculation and award of lost profits may not be based on speculation. *Texpor Traders*, 720 F.Supp. at 1114; *Harbor Hill*, 348 N.Y.S.2d at 924. Where, as here, there was no existing market for 114Bs at the time of the alleged breach, even assuming there was a breach of contract, we could not simply grant Coastal damages in the amount of the difference between the expected retail price and dealer discount price for all the aircraft that Coastal alleges Commander was obliged to deliver over the life of the contract. Coastal's reliance on section 2–713 in support of this simple mathematical formula is misplaced. An award of damages under that section assumes the existence of a "market price," which in turn assumes a market demand. Although the

114B was an upgraded version of the predecessor 114, for all intents and purposes, the 114B was a new product with no sales history. The predecessor version was last produced in 1979, and cannot reasonably be compared to the 114B for the purpose of establishing a 1992 market demand or market price. Because no "market price" for 114Bs at the time of the alleged breach was established, we reject Coastal's claim that it is entitled to damages calculated by subtracting "contract price" from the "market price" pursuant to section 2–713. We next address whether Coastal can recover lost profits as consequential damages under section 2–715.

■ The general UCC proof sequence for damages under that section is causation, foreseeability, certainty (reasonable or less) and mitigation. *See* N.Y.U.C.C. § 2–715 cmt. 2–4 (McKinney 1993). The injured party bears the burden of proving the first three factors, whereas establishing non-mitigation is up to the wrongdoer. *Id.* Similarly, under New York common law, the recovery of lost profits as damages for breach of contract is subject to the following requirements:

> First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.... In addition, there must be a showing that the particular damages were fairly within the contemplation of the par-

ties to the contract at the time it was made.

*Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234, 234–35 (1986) (per curiam) [*Kenford I* ].[6] *See also Travellers Intern., A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1577–78 (2d Cir.1994); *Trademark Research Corp. v. Maxwell Online, Inc.,* 995 F.2d 326, 332–34 (2d Cir.1993); *Bausch & Lomb Inc. v. Bressler,* 977 F.2d 720, 728–29 (2d Cir.1992); *Jewell–Rung Agency,* 814 F.Supp. at 342. In a later decision in the *Kenford* case, the New York Court of Appeals emphasized that "damages which may be recovered by a party for breach of contract are restricted to those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed." *Kenford Co. v. County of Erie,* 73 N.Y.2d 312, 540 N.Y.S.2d 1, 5, 537 N.E.2d 176, 179–80 (1989) [*Kenford II* ]. *See also Travellers,* 41 F.3d at 1578; *Trademark Research,* 995 F.2d at 332.

Applying these factors to the present case—causation, foreseeability, and reasonable certainty of proof of damages—we find that, even assuming there was a breach of contract, plaintiff has failed to meet its burden of proving damages for lost profits.

## A. CAUSATION

In order to recover loss of future profits as damages for breach of contract under New York law, a plaintiff must "demonstrate[ ] with certainty that such damages have been caused by the breach...." *Kenford I,* 502 N.Y.S.2d at 132, 493 N.E.2d at 235. There

---

**6.** Coastal attempts to distinguish the instant case from *Kenford I* and its progeny by arguing that the instant case involves a contract for the sale of goods (and is therefore governed by the New York Uniform Commercial Code) rather than a contract for services (governed by common law). Coastal's attempt to rigidly delineate UCC and common law principles is misplaced. In *Jewell–Rung Agency, Inc. v. Haddad Organization, Ltd.,* 814 F.Supp. 337 (S.D.N.Y.1993) (action for breach of contract for the sale of goods), the court recognized that because of *Kenford I* 's "heightened standard of proof for new businesses ... new ventures will have difficulty demonstrating lost profits...." 814 F.Supp. at 342. *See also Bausch & Lomb Inc. v. Bressler,* 977 F.2d 720 (2d Cir.1992). We conclude that rules

of law under the UCC and the common law are not mutually exclusive. In the instant case, although Coastal correctly points out that the UCC provides for lost profits as damages measured from the time of breach, such damages are only permitted to the extent that plaintiff can prove there was a market price for the undelivered goods. Coastal cannot reasonably argue, however, that there was a market price for a product that had not yet even been delivered to market or received any order for delivery. That plaintiff and defendant may have targeted a certain retail price for the aircraft is not dispositive. Because there was no market yet for the 114Bs, the principles set forth in *Kenford I* and its progeny are directly applicable to this case.

can be no dispute that the damages claimed by Coastal for lost profits can be traced directly to Commander's alleged breach of contract.

## B. FORESEEABILITY

■ An award of damages for lost profits will stand only if liability for such damages was contemplated by the parties at the time of contracting. *Travellers*, 41 F.3d at 1578; *Kenford II*, 540 N.Y.S.2d at 3–4, 537 N.E.2d at 177–79; *Kenford I*, 502 N.Y.S.2d at 132, 493 N.E.2d at 234–35. As articulated by the New York Court of Appeals:

> In determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered ... as well as "what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made."

*Kenford II*, 540 N.Y.S.2d at 4, 537 N.E.2d at 179. We conclude that, even assuming a contract was formed, the parties did not contemplate that Commander would assume liability for consequential damages arising out of its failure to deliver. Paragraph 10 of the Dealership Agreement contained the following exclusion for consequential damages:

> Commander agrees to use its best efforts to satisfy and fill orders placed by Dealer. However, it is understood that lead times will vary according to manufacturing and other conditions and, consequently, any and all delivery dates communicated by Commander are mere estimates and under no circumstances shall Commander on account of late delivery o[r] non-delivery be liable to Dealer, its agents, customers or any other persons for any special or consequential damages, whether based upon lost goodwill, lost resale, lease or rental profits, work stoppage, impairment of other goods, breach of contract, negligence or such other actions as may be deemed or alleged to be the cause of a loss or damage to such a person.

Although Coastal does not allege that it executed a Dealership Agreement (and therefore does not explicitly admit that it is barred by this clause), and instead bases its claims on the letters exchanged between the parties, Coastal cannot dispute that the ultimate goal was to execute a Dealership Agreement. Coastal's awareness of and attention to the Dealership Agreement is evidenced by its attempts to amend provisions which it deemed problematic—e.g., the deposit requirement and the liability provision. At no point did Coastal express concern over the consequential damages exclusion in paragraph 10. As such, we can only conclude that neither Coastal nor Commander contemplated that Commander would assume liability for lost profits or other consequential damages for non-delivery.

## C. REASONABLE CERTAINTY OF PROOF OF DAMAGES

■ In addition, we have found no case from a New York State court permitting a recovery of lost profits to a "new business." The seminal case representing New York's reluctance to permit such recovery is *Cramer v. Grand Rapids Show Case Co.*, 223 N.Y. 63, 119 N.E. 227 (1918). The defendant in *Cramer* breached its contract to deliver furniture to plaintiffs thereby preventing the latter from opening their ladies clothing store in a timely fashion. 223 N.Y. at 66, 119 N.E. 227. In reversing an award of lost profits, the court noted that evidence of plaintiffs' subsequent profit, earned after they were able to open their store, was insufficient proof of what their lost profits would have been had defendant not breached the contract. *Id.* at 67, 119 N.E. 227. The court implied that a new business would almost never be able to establish sufficient proof to recover lost profits. *See id.* New York was thus characterized as having a *per se* rule of non-recoverability of lost profits to a new business. *See, e.g., Manniello v. Dea*, 92 A.D.2d 426, 461 N.Y.S.2d 582, 585 (1983) ("[A] new business ... will not be allowed to recover anticipated profits since no basis exists upon which to estimate the amount of the lost profits.").

The New York Court of Appeals has since clarified that a plaintiff seeking lost profits as damages for breach of contract must "demonstrate[ ] with reasonable certainty that

such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach...." *Kenford I,* 502 N.Y.S.2d at 132, 493 N.E.2d at 235. In so doing, the *Kenford I* Court reaffirmed *Cramer's* holding, and explained that *Cramer* stood for the proposition that "[i]f it is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of experience upon which to estimate lost profits with the requisite degree of reasonable certainty." *Kenford I,* 502 N.Y.S.2d at 132, 493 N.E.2d at 235 (citing *Cramer,* 223 N.Y. 63, 119 N.E. 227). *See also International Telepassport Corp. v. USFI, Inc.,* 89 F.3d 82, 86 (2d Cir.1996) ("[T]he new business rule is not a per se rule forbidding the award of lost profits damages to new businesses, but rather an evidentiary rule that creates a higher 'level of proof needed to achieve reasonable certainty as to the amount of damages.'") (quoting *Travellers,* 41 F.3d at 1579).

## 1. NEW VENTURE

Commander urges the court to apply the heightened standard of proof of lost profits enunciated in *Kenford I,* arguing that Coastal's attempt to establish a distributorship for 114Bs was a "new venture." New York law imposes an especially demanding standard for computation of lost future profits in the case of a new business. *See Trademark Research,* 995 F.2d at 332; *Kenford I,* 502

---

7. Furthermore, Coastal operated its Aerospatiale franchise on greater margins than it would have under Commander's Dealership Agreement: Coastal received a 22.5% margin from Aerospatiale during the entire time that Coastal served as Aerospatiale's dealer. Tr. 71, 114. Obtaining sufficient margin was critical to the financial feasibility of entering into a *distributorship. See* Tr. 71. While Coastal had experienced profitability selling Aerospatiale aircraft at 22.5%, there were times when Coastal did not realize a profit at 22.5%. Tr. 72.

N.Y.S.2d at 132, 493 N.E.2d at 234–35. However, an established business's expansion in an area in which it has proven its expertise does not warrant the designation of "new venture." *Care Travel Co. v. Pan American World Airways, Inc.,* 944 F.2d 983, 993–94 (2d Cir.1991). Although the 114B was a new product without prior sales history, Coastal was experienced in selling similar aircraft from the Aerospatiale line. Thus, the "new venture" label is somewhat misplaced. On the other hand, the Southeast Territory encompassed only one state (Alabama) in which Coastal had sold a new Aerospatiale aircraft comparable to the 114B. *See* Def. ex. A.[7]

The New York Court of Appeals has instructed that the key issue is whether damages can be proven to "reasonable certainty." *Kenford I,* 502 N.Y.S.2d at 132, 493 N.E.2d at 235. Whether a business is a "new venture" or an ongoing operation of course will affect the quantity and quality of evidence relied upon by a plaintiff to prove lost future profits with "reasonable certainty." *See id.* Rather than focus on whether Coastal should be labelled a "new venture" or an ongoing business (in any case, Coastal's contemplated 114B franchise probably is best described as a hybrid between the two), we address the issue whether plaintiff can establish lost future profits with "reasonable certainty."

## 2. PROOF OF DAMAGES

In deriving their calculations, Coastal's experts relied on assumptions as to the number of aircraft that would have been sold at assumed prices, based on market conditions at the time of the alleged breach. For example, Zweifler based his report on an assumption that Coastal would have sold the equivalent[8]

---

8. In his report and on direct testimony, Zweifler uses the term "equivalency of revenue" to imply that he did make an assumption as to the number of aircraft Coastal would have sold:

 A I would refer the Court to page 2 of Exhibit 14, which recapitulates the three scenarios that were developed in arriving at my opinion.

 . . . .

 A In each of the scenarios a revenue estimate is made based on the equivalent—equivalency of either of new and used parts, retrofit services, and from three to five-and-a-quarter million dollars. . . .

of twenty to thirty aircraft (per year) during the term of the Dealership Agreement. *See* Pl. ex. 14, at 2; Tr. 183. Lomas assumed that Coastal would have sold ten new aircraft per year for three years in the Southeast Territory and seven new aircraft per year in the New York Area. Coastal justifies these assumptions on the ground that, under the UCC, the measure of damages must be taken at the time of the breach. Therefore, Coastal argues, the contemplated retail price of the aircraft and the number of aircraft targeted to be sold as of the time of the alleged breach control. Coastal asserts that the UCC does not permit a court to look at actual after-breach results of sales to discern whether or not it would have been able to sell aircraft in the number contemplated and at the targeted prices.

Commander, on the other hand, challenges Coastal's experts by attacking their assumptions regarding the number of aircraft Coastal would have sold. *See* Def. ex. V1 (only twelve new 114Bs sold in the United States by Commander and its distributors during the first eighteen months of the contract period, two of which were sold in the Southeast Territory and none in the New York Area). Commander argues that the actual sales results of 114Bs provide a more accurate indicator of the demand for 114Bs and therefore a more logical source for calculating how many aircraft Coastal would have been able to sell and whether Coastal would have made any profit. *Cf. Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 455 (2d Cir.1977) ("[Defendant] suggests that the best way of determining profits would be to consider the profits of an existing distributorship. But it came forward with no such proof....").

Coastal responds that looking at actual sales results is misleading because plaintiff would have sold aircraft more effectively than did Commander or its distributors. Coastal points to its successful experience in selling Aerospatiales, even during low points in the market. In short, Coastal insists that its experts' assumptions as to the number and price of aircraft that would have been sold by it are a more accurate indicator of the true market for 114Bs during the contract period than the actual experience of Commander and its distributors in selling 114Bs. We do not agree.

Q  Now, did you assume a number of units and an average price per unit in performing your calculations?
A  Only ... for purposes of defining the equivalency of revenues that might be earned by the company.
....
A  If you go to ... the exhibit in the middle of page 2 of Plaintiff's 14, you'll see that the simple mathematics of 20 times $150,000 equals three million.
It does not mean that I presumed that there will be 20 new aircrafts sold. It does mean that the equivalency of revenue would be earned by the company in one of several ways, either by the sale of new aircraft, the sale of traded in aircraft through it, the sale of support, parts support, and the sale of the retrofit program and add-on equipment and services.
Q  [H]ow did you develop the number 20? Why did you develop 20 and what average price did you develop?
Q  Number one, the price—the unit number was consistent with the history of Coastal as an Aerospatiale franchisee. It had in fact sold that number of aircraft in the past. Of course, the past is not an absolute predictor of the future.
And I had to consider the worldwide demand situation as reflected in the prices that would be charged for it and the ability of vendors to receive that money, and in doing so, from an economic point of view, I had to consider the price elasticity and the demand elasticity for an aircraft of this kind worldwide.
Q  How did you do that?
A  The stated price was, of course, in the record.
The question then was: Would a $169,500 offering price be the price that would be paid by an end user/buyer if in fact it was a new aircraft we are talking about?
And would it be increased or decreased by either a discount to try to get a sale, or would it be increased by the fact that the buyer had a desire to have an immediate delivery and was prepared to pay more for it, or that the buyer was prepared to acquire add-on equipment, which is often done, or painting, or some other special service that would be attendant to the initial purchase?
Would there be the equivalency, as I said earlier, in the form of other services and parts and so on?
Tr. 182–184. The fact that Mr. Zweifler defines the revenue generating units he incorporated in his report as "the sale of new, used aircraft, parts, warranty programs and retrofit contracts," *see* Pl. ex. 14, at 2, reveals that he made an assumption as to the demand for aircraft products, and the revenue that would have been generated from that demand.

Absent an existing "market price," Coastal must produce some proof that it would have been able to sell 114Bs at the purported prices and in the predicted quantity. *See* N.Y.U.C.C. § 2–713 cmt. 3 (McKinney 1993) ("When the current market price under this section is difficult to prove[,] the section on determination and proof of market price is available to permit a showing of a comparable market price or, where no market price is available, evidence of spot sale prices is proper."). In this case, Coastal's reliance on its experts' assumptions as to the market demand and market price for 114Bs is to no avail, particularly in light of the fact that neither expert purported to be an expert in the demand for aircraft. Coastal emphatically rejects reliance on post-breach actual sales results as an indicator of market demand and market price. However, plaintiff has submitted no evidence nor any persuasive argument that the actual sales results of the 114Bs provide an unreliable indicator of the market demand for 114Bs. Plaintiff's sole reliance on section 2–713 to support its experts' assumptions regarding market price is fatal to its case.

Even assuming that Coastal had outstanding sales experience, we are unconvinced that plaintiff would have sold enough aircraft to earn any profit on the purported contract. The record indicates that only twelve new 114Bs were sold domestically during the eighteen months following the alleged breach, and only two in the Southeast Territory (both in Maryland). *See* Def. ex. V1. In a case such as this where the court is presented with predicting the performance of a distributorship attempting to sell a new product (even if the distributorship itself is not a new venture), we are hesitant to rely on stated assumptions as to the number of aircraft that would have been sold and the prices at which they would have been sold. Because the 114B was a new product, or at least a new model significantly upgraded

from the predecessor model, no "market price" existed at the time of the alleged breach. Although the price of goods, without a "market price," may be shown by opinion as to value, *see* N.Y.U.C.C. § 2–713 cmt. 3 (McKinney 1993), neither of plaintiff's experts purported to be experts in the market demand for 114Bs and therefore neither could opine as to what price or quantity the market would have borne. Rather, we find it useful to examine the actual sales results of 114Bs in the areas that were supposed to be awarded to plaintiff. We find no support in the case law or the UCC for plaintiff's assertion that the after-breach actual sales performance of 114Bs is irrelevant. In fact, the case law suggests a contrary conclusion. *See Lee,* 552 F.2d at 455.

As for plaintiff's first expert, beyond the fact that Zweifler is not qualified to give an opinion as to the demand for 114Bs during the contract period, there is a more fundamental problem with his report. Coastal seeks damages for lost profits for an alleged breach of an option contract for the New York Area and an alleged breach of contract for the Southeast Territory, and for out of pocket costs and expenses. *See* Compl. ¶ 5. However, Zweifler's report opines as to the value of a dealership in the New York Area and the Southeast Territory. *See* Pl. ex. 14, at 1 ("It is our opinion that[,] strictly from an economic point of view, the value of these two dealership franchises at the valuation date was in the amount of … $2,700,000.… Market value herein is defined as the amount at which a property … would change hands between a willing buyer and a willing seller. …"). A review of Zweifler's analysis reveals the important distinction between an opinion as to the lost profits suffered as a result of the alleged breach and an opinion as to the lost market value of a franchise.

Based on the assumed number of units sold,[9] the analysis assumes a 5% after-tax

---

9. The report does not indicate whether the assumed number of "aircraft or equivalent" sold is an annual figure or a figure for the life of the contract—three years. However, we conclude that it must be an annual figure because the

analysis calculates an annual earnings figure (described as the owners' discretionary benefits per year) based on the number of units sold. Although Zweifler uses the term "equivalency of

profit.[10] Therefore, the report concludes that Coastal's lost profits were between $150,000 (for twenty "units") and $262,500 (for thirty "units") per year for each franchise. Even assuming that Coastal could have sold twenty "units" per year—an assumption we find highly dubious in light of the facts that the parties had discussed ten new aircraft per year and that the actual sales performance fell far short of ten new aircraft per year in either territory [11]—the report calculates Coastal's lost profits to be $150,000 per year. Assuming lost profits of $150,000 per year for each territory (the New York Area and the Southeast Territory), according to Zweifler's report, Coastal suffered a total of $900,000 in lost profits (assuming Coastal is entitled to three years of lost profits), a far cry from the $2,700,000 that the report concludes was lost, and an even farther cry from the $5,319,324 that Coastal seeks in the Complaint. The $900,000 figure is further reduced by fifty percent if the eighteen month termination clause in paragraph 10 of the Dealership Agreement applies.

A fundamental problem we find in the report is that the analysis applies a "goodwill multiple" to lost profits, and then adds a working capital figure to reach a "Total Value of Dealership." By applying a multiple to earnings, the report goes beyond calculating lost profits and begins valuing the dealership as an ongoing enterprise. However, Coastal asserts claims for lost profits, not deprivation of the dealership as an ongoing entity. Indeed, because of the termination clause in the Dealership Agreement, we doubt that Coastal could recover consequential damages for the lost value of an ongoing dealership even if such damages were alleged and sought, which they were not. Finally, the court is aware of no principle of economics that would support valuing a franchise by taking a multiple of earnings (which by itself is widely recognized and accepted as a valuation technique) and then adding working capital to that product. Our main concern with the analysis, however, is that it purports to value a franchise, rather than calculating lost profits. To the extent that we are able to discern an opinion as to lost profits, the report supports a calculation of lost profits of $150,000 per year per franchise—and even this calculation is based on highly optimistic and unsupported assumptions regarding sales units,[12] and is therefore rejected.

We next turn to Lomas's testimony in which he calculated lost profits of $1,156,440 for the Southeast Territory, and 70% of that amount—or $809,508—for the New York Area. See Pl. ex. 34; Tr. 310.[13] Lomas's accounting report at least addresses the proper issue—i.e., lost profits during the term of the contract, rather than the lost market value of a distributorship. See Pl. ex. 34. However, the report is wrought with unsupported and speculative assumptions. For the Southeast Territory, Lomas calculated $527,940 in lost (pre-tax) profits over three years based on sales of ten new aircraft per year. The report than assumes $577,500 earned over three years on upgrades of 77 aircraft, and adds $51,000 for "parts override." Lomas does not state from where he

---

sales," we treat this figure simply as the number of "units" sold.

**10.** The analysis calculates "owners' discretionary benefits," which is defined as after-tax salaries paid to principals plus net earnings of the franchise. See Pl. ex. 14, at 2; Tr. 188, 191. We will refer to this figure as "net earnings" or "profit" because it represents the sum benefit to the principals of an enterprise, whether the benefit is taken as salary to the principal or earnings of the franchise. See Tr. 191. Based on an analysis of comparable enterprises, the report assumes earnings of 5% of revenues. Tr. 189.

**11.** Even taking into account Zweifler's expanded concept of "equivalency units," 20 units per year seems unreasonably high.

**12.** Coastal points to various marketing projections issued by Commander in support of Zweifler's optimistic sales assumptions. However, we conclude that the actual sales performance during the contract period, as opposed to pre-breach sales predictions, is a more accurate indicator of the market demand, and therefore a more reliable figure for calculating lost profits.

**13.** Lomas calculated lost profits of $1,156,440 for the Southeast Territory, see Pl. ex. 34, and testified that the lost profits for the New York Area would be 70% of the projection for the Southeast Territory. Tr. 310.

# 1070

obtained the figures to calculate the profits from the upgrades or the overrides. More importantly, Lomas is not an expert in the demand for 114Bs, and cannot support the assumption that Coastal would have sold ten aircraft per year for three years in the Southeast Territory, and seven aircraft per year in the New York Area.

In short, Coastal bases its lost profits claims on speculation regarding the number of aircraft it would have sold during the period in question. We would be inclined to grant plaintiff some leeway in producing evidence regarding the demand for 114Bs and with respect to plaintiff's ability to market the product effectively based on its skill and experience. However, based on the actual sales performance of 114Bs in the market after the alleged breach, we find it difficult to believe that plaintiff would have realized any profit on a 114B dealership. Plaintiff does not dispute the poor sales performance of 114Bs following the alleged breach. Rather, plaintiff simply asserts that it would have done a better job selling the aircraft. Despite plaintiff's experience in selling Aerospatiale aircraft, we conclude that plaintiff has failed to prove, by a preponderance of the evidence, that it would have been able to repeat its success with the 114Bs, particularly in light of the fact that Coastal enjoyed significantly greater margins on the Aerospatiale aircraft (22.5%) than it would have on the 114Bs (15% in the first year).[14] Even assuming there was a contract and subsequent breach, we are unconvinced that plaintiff would have been able to sell all of the aircraft it was committed to purchase or to realize any profit. Plaintiff does not assert that it should recover any restitution or reliance damages. To award plaintiff lost profits based on the unproven assumption that it would have sold at list price every aircraft it had agreed to purchase would unjustly reward plaintiff rather than make it whole. In fact, Coastal may be fortunate not to have been obliged to purchase 114Bs for distribution in the New York Area or the Southeast Territory.

**14.** Even with a 22.5% gross margin on Aerospatiales, Coastal was unprofitable in 1991. *See* Def. ex. Y1.

**15.** Coastal offered no evidence regarding lost profits resulting from Commander's failure to

## III. Mitigation

Even assuming that Coastal can prove lost profits with reasonable certainty for Commander's breach of its agreement to provide aircraft to Coastal for the Southeast Territory, Coastal's damages would be limited to lost profits associated with Georgia and Alabama. Coastal cannot dispute that, after Commander withdrew the purported March 30, 1992 offer, Commander immediately proposed an arrangement involving the Southeast Territory minus Georgia and Alabama. *See* Pl. ex. 10. Coastal cannot recover for those damages that could have been avoided had it executed a Dealership Agreement for a distributorship in the reduced territory. Instead, Coastal insisted that it had already accepted Goodman's March 30, 1992 offer for the Southeast Territory, and refused to acknowledge Beckett's abridged proposal for the remaining states, claiming that it "couldn't accept" Commander's proposal after all that had happened. *See* Tr. 285. Coastal responded to Beckett's offer with a threat that it would sue for damages if the entire Southeast Territory were not awarded, and it failed to mitigate its damages by taking what it could get.[15]

## CONCLUSION

For the foregoing reasons, we find in favor of defendant on all claims. Each party shall bear its own costs.

SO ORDERED.

sell 114Bs for distribution in Georgia and Alabama. *See* Tr. 220, 245–249.